

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-15-00263-CV**

IN THE INTEREST OF M.H., II, A
CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
TRIAL COURT NO. CIV-14-0611

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court terminated both Mother's and Father's parental rights to their son, M.H. On appeal, both Mother and Father attack the legal and factual sufficiency of the evidence to support the trial court's findings. We affirm as to Father. We reverse and remand as to Mother.

---

[1]*See* Tex. R. App. P. 47.4.

**Background**

<u>M.H.'s Premature Birth and the CPS Investigation Soon Thereafter</u>

M.H. was born in March 2014 by C-section. He was born premature at thirty-two weeks. A normal term is forty weeks. M.H. did not leave the hospital until slightly more than three weeks later, in mid-April 2014.

In April 2014, Marnie Rist, a Child Protective Services (CPS) investigator, was assigned to investigate the case. Rist testified that the information received by her as noted in the intake report concerned observations by hospital staff of Father's behavior with M.H. in the hospital room. Father was described as acting aggressively towards the baby, engaging in "inappropriate dialect" towards the baby, and leaving for long periods of time. The intake report also indicated that Mother and Father were arguing in the hospital room.

Rist began her investigation by interviewing the parents. Regarding Father's language, Rist testified that Mother confirmed Father was trying to feed M.H. and that Father told M.H. to "hurry up and eat you little shit." Mother expressed concerns about that language and did not like it. When Rist spoke to Father about his language, Father responded that Rist was not going to tell him how to talk to his baby. Rist testified that Father initially did not answer her regarding whether there was anything wrong with talking to M.H. that way, but Father later called her and explained that he was using that language as a term of endearment.

Regarding the physical handling of M.H., Rist testified that the hospital staff described Father as being "rough" with M.H. Rist noted that the baby was very young and vulnerable. He was still in the NICU. Rist said both Mother and Father denied that there was any reason for her concern. Rist, herself, did not witness Father handling the baby.

When Rist asked Father about Mother and Father's arguing in the hospital room, Father responded that he and Mother argued like most couples, that is, their arguing was normal and not excessive. Rist said she spoke with some of the hospital staff about the arguments, and the hospital staff indicated the arguing was sufficient to alarm them.

Rist also discussed drug use with the parents, although she did not see any drugs nor did Father appear to be under the influence of any drugs. At the hospital, Father initially denied any drug use but later admitted using "just about everything" in the past but maintained that he was currently using only marijuana. Father took a drug test that was positive for marijuana. Mother tested negative for drugs.

Rist recommended that the parents go to Family Based Safety Services (FBSS), and they agreed to counseling, parenting classes, and drug awareness classes. Rist said she saw nothing in her contact with the parents to indicate anything inappropriate or that reflected abuse or neglect at that time, but her concerns were enough to refer the parents for services.

The FBSS worker testified that Mother and Father were cooperative. The FBSS worker visited their home twice in May 2014. She had no concerns at that time. Other FBSS workers went to see M.H. in June and July 2014.

Father's Friend, C.S., and the Events of July 2014

C.S., an acquaintance of Father, had known Father about four years. They had met when C.S.'s mother brought Father home to live with them because Father had nowhere to stay. He had been sleeping in the parking lot where C.S.'s mother worked. Father lived with them for about a year. C.S.'s mother later kicked Father out because of concerns that he was doing drugs.

C.S. had seen Father smoke marijuana, and Father had told her that he had used other drugs before she met him. She saw nothing to indicate he was still using other drugs until after Father left her house, which she noticed because there were times when "he was just not all there." C.S. had seen Father get angry but had never seen Father act out. C.S. had, on a couple of occasions, seen Father respond with inappropriate anger given the situation. C.S. agreed that Father had a "hair trigger."

C.S. stayed in touch with Father after he left. She knew that he stayed with friends "here and there," and then got an apartment. She got him a job where she worked and saw him on a daily basis for a while. C.S. said that he worked there "temporarily," and agreed that he was not able to keep any job very long. C.S. did not remember how she met Mother but recalled that Father introduced them and that Mother and Father were together. She knew they had

4

an apartment in Section 8 housing, that neither of them was working, and that Mother was going to school.

C.S. learned about the baby before he was born; she recalled that both Father and Mother were very excited. Mother was able to make all her appointments with the doctor. C.S. visited them after the baby was home from the hospital. She had no concerns about the baby before or after his birth until the baby was about three months old.

On July 19, 2014, C.S. was on her way home from work when Father messaged her, stating that he was leaving the house and that Mother had told him he had to go because he had gotten too rough with M.H. C.S. testified that she called Father, and Father explained that M.H. was not drinking properly, so Father hit M.H. in the face with a towel, after which Mother told Father to leave. C.S. testified that Father did not think he had been too rough with the baby. At both Mother and Father's request, C.S. then went to pick up M.H. with the idea of keeping him for a couple days. C.S. testified that when she discussed the incident with Mother, Mother concurred that Father had hit M.H. in the face with a towel. C.S. said Mother thought Father was more aggressive than playful; Father saw nothing wrong with his behavior.

C.S. kept M.H. the night of July 19, 2014. She picked M.H. up around 6:00 p.m. When C.S. took M.H. to her home that evening, C.S.'s mother, who was a registered nurse, said that there was something wrong with M.H.'s breathing.

5

C.S. said she assumed M.H.'s breathing issues were because both Mother and Father smoked in their home.

C.S. kept M.H. that night, but the next morning she called Mother and Father around 7:00 a.m. and told them to take M.H. to the hospital and that, if they were not prepared to take M.H. to the hospital, she would take M.H. to the hospital without them. C.S. said that M.H. seemed to be having problems breathing and had awakened in the middle of the night "kind of choking." Thinking that M.H. had a lot of phlegm, C.S. sat M.H. up, patted him on the back, and put him in the swing so he could sit upright. Mother and Father took M.H. to the Azle hospital with C.S. C.S. was present in the room with Mother and Father and said M.H. seemed to have breathing problems; Mother and Father simply stated that M.H. always made noises like that. The staff at the hospital said that nothing was wrong with M.H. There were no concerns about abuse or neglect; however, the hospital did not take any x-rays of M.H. C.S. then took Mother, Father, and M.H. to their home. That was the last time C.S. saw Mother and Father.

A couple of days later, Father called C.S. and accused her of doing something to the baby. C.S. said Father complained that M.H. would not stop crying. C.S. related that she told Father that she had done nothing to M.H. C.S. denied injuring M.H. and said there was no possible way she hurt M.H. At trial, C.S. testified she did not hurt M.H., she did not throw him, bounce him, drop him, or hurt him in any way. That night was the only time she kept M.H.

6

On July 22, 2014, an investigator from the Department of Family and Protective Services (the Department) interviewed C.S., and C.S. told the investigator that Father had taken M.H. to Weatherford Regional Hospital, but when the investigator called that hospital, she was told that the emergency room there had not seen anyone with Father and M.H.'s last name. On the same day, a worker from FBSS went to Mother and Father's home to give them a drug test and to deliver a mattress to them and, although the FBSS worker could hear a TV in the house and heard what sounded like someone coming to the door, no one answered the door. The FBSS worker also called Mother and Father's phone, but no one answered.

The next day, July 23, 2014, Joy Hallum, a Department investigator, and an officer with the Springtown Police Department went to Mother and Father's home and knocked several times. Eventually, Father answered the door and explained that he and Mother had been asleep all day. When Hallum asked about M.H., Mother and Father said that they had taken him to the hospital in Weatherford for a staff infection but that no x-rays had been done. Hallum asked Mother and Father to take M.H. to Cook Children's Hospital immediately, and they did so.

At Cook Children's Hospital, the ER physician assigned to the case ordered a full skeletal survey, x-rays, and CT scan; the results showed a broken rib and what appeared to be fractures of both legs. Both Mother and Father told the investigator that they did not know how the injuries occurred. Hallum

7

obtained authorization for removal by the Department and served notice to Mother and Father that M.H. was being taken into the care of CPS at that time and would be placed in a temporary foster home. The Department filed its petition for emergency removal, appointment of the Department as temporary managing conservator, and termination of Mother and Father's parental rights the next day.

The Medical Testimony Regarding the July 23, 2014 Hospital Visit

Dr. Jamye Coffman was a child-abuse pediatrician and the medical director of the CARE team, which was the child abuse program at Cook Children's Hospital in Fort Worth. Dr. Coffman did not personally see or examine M.H. at the time of M.H.'s visit to the emergency room but testified based on her review of the medical records. The x-rays showed a healing fracture on the right tenth posterior rib.

Dr. Coffman testified that something had happened to the rib within the previous month that caused the fracture. She explained that there was callus formation—bone formation—showing that the bone was healing. Because everyone healed differently, she could not narrow down when the injury occurred. Dr. Coffman estimated the fracture was a few weeks old—possibly two, four, or even five weeks old. Because there was callus formation, Dr. Coffman said the injury was not something that could have happened within the previous seven to ten days.

Dr. Coffman testified part of her training was to look for an explanation for the injury. The records reflected no explanation. The child was about four months old at the time. Because a four-month old boy could not injure himself, Dr. Coffman was concerned about the possibility of abuse. She explained that rib fractures can occur at childbirth, but this fracture was not four months old; it was only weeks old. Dr. Coffman could not say whether the rib fracture was an accident or how it happened, but she stated rib fractures in infants did not happen in the normal handling of a child. A rib fracture like M.H.'s would not be accidental unless someone ran him over with a car, nor could it be from dropping him unless it was from a second story window onto something with an edge like a curb. That type of injury required direct pressure sufficient to break the bone. Dr. Coffman said the force needed was significant. She acknowledged there was no history of something like that happening. In her medical opinion, a rib fracture without an explanation and with no history of major trauma was extremely concerning for child abuse.

Dr. Coffman acknowledged that initially there were concerns by the ER physician who saw M.H., so that physician ordered the initial x-rays and concluded that M.H. had bilateral leg fractures as well.[2] M.H.'s legs had "some curvature to them, and what looked like some sclerosis so it could have been a

---

[2]The removal affidavit by the ER physician, which was apparently written and signed by him before the radiologist saw the x-rays, identified a broken rib and "bilateral tibial buckle fractures."

healing fracture." However, the radiologist who later interpreted the x-rays determined there were only "possible" fractures in the legs and called for a re-evaluation in two weeks.

Dr. Coffman explained that when she followed up with a re-evaluation of M.H. two weeks later and examined new x-rays of his legs, the curvature looked exactly the same with the identical thickening of the bone in the legs. If there had been trauma, she explained, then there would have been a visible change in the callus; the absence of any change—the absence of any healing process—meant there was no trauma. M.H.'s leg condition was dismissed as being a "normal variation." There were no leg fractures.

The Family Therapist's Testimony

Jill Bounds, a family therapist with Lena Pope Home, has a master's degree in marriage and family counseling and is a licensed professional counselor. Bounds testified that she started seeing Mother and Father in January 2015. The Department was concerned about possible drug use, possible domestic violence, possible child abuse regarding a broken rib, and financial issues.

As far as Bounds knew, Mother and Father were passing their drug tests and were saying that they were through with drugs, so she did not spend much time on drug issues. Both Mother and Father denied any domestic violence, so they did not explore those issues either. However, they did explore anger management and how to express anger. Father admitted having trouble with

anger and admitted he had made holes in their apartment from losing his temper. Bounds did not recall if Father admitted getting angry in front of M.H. She testified that getting angry "like that" in front of a child and a spouse was not good because it created a climate of fear.

Regarding financial issues, Bounds testified neither parent was working when they came to see her, and Father expressed that his last job was really hard and that he was really depressed. Bounds said, however, that within a few months, both Mother and Father had jobs. Bounds was aware that they had free housing, that they had a car, and that they both had been working recently, so she concluded that, financially, things were getting better. Early on, Father expressed concern about losing their free housing if he earned too much.

Bounds described Mother as always being very cooperative, open, honest, and willing to work on anything in her life. Bounds described Father as, at least in the beginning, being very cooperative, open, and genuine. In the last few sessions, however, things changed. Father came to sessions wearing music headphones and dark sunglasses, fell asleep, and acted like he absolutely did not want to be there. Bounds considered the headphones disrespectful. Bounds said Father participated but was not really engaged. During the last three or four sessions, she described Father as somewhat more cooperative. Bounds said that Father understood that the court ordered the counseling sessions as part of his service plan. Neither Mother nor Father had yet completed their counseling. But Bounds declined to say Father had failed. Bounds hoped that "after this,"

11

(apparently referring to the trial), Father would have a better attitude, cooperate more, and be more engaged in the therapy process.

Regarding the child abuse concerns, Bounds recalled that Father acknowledged that he and Mother got into an argument over how he fed the child. Father said he wiped M.H.'s face too hard while feeding him, and Mother "called him on it." Both Mother and Father said that the argument escalated and that both became irrational. Bounds said Mother and Father were ready to split up over the argument, but Father called a friend and asked the friend to help with the baby because they were arguing. Bounds did not recall any discussion of any rough treatment of M.H. other than this one incident.

Bounds was aware that CPS became involved because M.H. had a broken rib. Bounds discussed that with Mother and Father as well. She said that they had concluded that a babysitter's four-year-old child stepped on the baby's ribs. When asked why they thought that, Bounds responded, "That's the only conclusion they could come up with." She said that Mother and Father asserted that the four-year-old was in the same bed as the infant. Bounds characterized Mother as believing Father. Nevertheless, on one occasion Mother had said she was "not a hundred percent sure" whether Father was not responsible for the rib injury.

Regarding the holes in the wall, Mother just said she was thankful that Father had repaired them. Bounds said Mother and Father also described an incident of reckless behavior when Father drove a car very fast and wrecked it.

12

Bounds said that Mother and Father reported that a friend was in the car and challenged or dared Father to "punch it," so Father "punched it," and the car flipped over three times. M.H. was not in the car at the time. Bounds said Mother expressed concern about whether Father would have done it even if M.H. had been in the car. Bounds elaborated, "In almost [a] playful, joking[ ] manner[,] she said I know he would have done it had the baby been in the car. He thinks before he acts sometimes."[3] Bounds agreed that at least part of Mother was willing to admit there was a danger.

Bounds said, "I've been trained to look at a person's actions and not so much their words. And her actions have very much been that she's going to stand by her man." When asked if Mother would stand by Father to M.H.'s detriment, Bounds responded, "[I]n my opinion there's enough question to cause concern for the child." Bounds said Mother had expressed concern that Father could be a danger to the child but had also said she was going to stand by Father and remain with him. When asked if Bounds thought Mother would consciously disregard the dangers Father posed to the child to keep her relationship with Father, Bounds answered, "In my opinion it seems as if yes, that is the case." When asked what danger Father posed to M.H., Bounds answered, "I believe he does have an explosive, impulsive manner about him." Bounds did not know what CPS's findings were regarding whether Father or Mother broke M.H.'s ribs.

---

[3]Bounds appeared to mean, "He acts before he thinks sometimes."

13

Bounds acknowledged that an unknown person possibly abused the child. She added, however, that the unknown person was potentially Father.

Bounds said that in February 2015, Father reported that he spat on his mother's dead body and planned to spit on his father's dead body once his father was deceased. Bounds testified that in February 2015, both Mother and Father reported that Father had left knuckle marks in the steel door of their apartment when Father punched it while angry. Bounds also recalled that in February 2015, Father stated that he would feel like he succeeded as a father if M.H. went to jail one less time than he had.

The couple reported the car accident to Bounds in March 2015; the car flipped three times; Mother was in the car and received a bump on her head. Bounds testified that in March 2015, Mother reported that she was concerned that Father was having difficulty controlling his anger and believed Father needed to return to anger management. Bounds said Father declined additional anger management classes because of his work schedule.

Bounds agreed that Father had impulse control problems. Bounds said, "His behavior still concerns me for the safety of the child." M.H.'s age, being only a year old, increased the concern.

The Caseworker's Testimony

Amanda Rodriguez, Mother and Father's caseworker after M.H.'s removal, said she discussed M.H.'s injury with Mother and Father. They indicated to her that they believed M.H. was left in a pack-n-play with a four-year-old child, that

14

the four-year old stepped on M.H.'s rib, and that was how M.H.'s rib was broken. Rodriguez said they explained that C.S. had M.H. and placed him in the pack-n-play with her four-year old. Rodriguez did not remember if Mother and Father told her how they knew that.

Rodriguez described instances she observed during visitation times, when she thought Father was handling M.H. roughly. She said that on December 19, 2014, Father had M.H. on Father's knees and was holding M.H. at the waist and moving M.H. in a circular motion. Rodriguez said M.H. did not seem to be stabilized, so she tapped on the window of the visitation room and asked Father to stop because M.H. was too young to be doing that. On June 12, 2015, Father placed M.H. on his legs and shook him; however, Rodriquez was not there for that visit and had to rely on the notations of the person who had observed the visit. When asked how Father responded to correction, Rodriguez said, "He typically becomes defensive and doesn't want us to tell him how to interact with his child." When asked how Father responded when told why his behavior was dangerous, Rodriguez said, "Most of the time he'll be defensive and then he'll just kind of not respond after a while. Just kind of ignore me." Rodriguez said that when she corrected Father, Mother did not speak up or try to stop Father. Rodriguez complained that she could instruct them not to treat a very small child that way, but they would continue to treat the child as they had before. Rodriguez testified that was not good for the safety of the child. Rodriguez

15

acknowledged that Father's handling never got to the point where his visitations were stopped or where CPS had to call the police.

Rodriguez said the court signed an order to perform the services. Father had to complete a drug and alcohol assessment; Rodriguez said Father completed the assessment on August 18, 2014. However, Rodriguez added that Father was referred to a one-day drug and alcohol awareness class in Granbury and Father had not completed that class. Rodriguez said that Father's failure to complete that recommendation constituted a violation of the court order.

Both Mother and Father were required to have employment. Father provided Rodriguez with two pay stubs, one from June 9 through June 22, 2015, with a net of $337.50, and the other from June 23 to July 6, 2015, with a net of $429.54. Rodriguez said that Father maintained employment but failed to show stability in employment. Rodriguez added that she did not consider waiting until shortly before trial to get a job to constitute successfully completing the service plan. Trial was on July 24, 2015. Rodriguez acknowledged that Father had told her that he did not have check stubs because he worked for cash, but she did not know if he was, in fact, working.

Rodriguez said Mother had provided her with several pay stubs since January and had grossed $2,420.40 for the year. Rodriguez said both parents had to complete an MHMR assessment, and both had completed those on September 30, 2014. Neither was referred for services. Both parents were required to do parenting classes, and both had completed those.

Rodriguez testified that Father had to participate in anger management counseling. Father had completed the required eight sessions and had said he had continued going thereafter because the couple's marriage improved while he was attending them, but at some point Father stopped going to them. Rodriguez did not consider Father to have completed his anger management because she thought Father understood that he needed to keep going to classes. Rodriguez acknowledged, however, that Father had finished his anger management class and that she had a copy of his anger management certificate. Rodriguez said that Mother had to go to domestic violence counseling, Mother did the domestic violence intake, and Mother was not offered any additional services.

Rodriguez testified that Mother and Father attended visitations with M.H. Father missed some visits because he said he was working, but Rodriguez said Father did not provide her with pay stubs for some of the visits he missed. Rodriguez went to Mother and Father's home on January 12, 2015, and, except for the fact they smoked, thought that their home was appropriate.

Regarding random drug testing, Rodriguez said she sent both Mother and Father for a urinalysis on January 30, 2015. Mother went; Father did not. Rodriguez sent both again on March 13, 2015; Father was positive for marijuana; Mother was negative. Rodriguez sent them for a urinalysis on July 10, 2015; Mother went and was negative, but Father did not go.

Rodriguez testified that both Mother and Father were required to do individual counseling and that neither had completed that requirement.

17

Rodriguez said that the initial referral for counseling expired, so a second referral was done on November 6, 2014, but Mother and Father waited until January 7, 2015, to start counseling. However, Rodriguez acknowledged that there was a waiting list of four to six weeks at the Lena Pope Home; in Mother and Father's case, it had taken eight weeks. Rodriguez conceded the holidays in December might have contributed to the delay.

Rodriguez said Mother never expressed to her a willingness to protect M.H. from Father. Rodriguez said Mother worked her service plan better than Father but even she had not worked it completely. Rodriguez testified that the big concern was protecting M.H., but Mother had not done anything to help Rodriguez believe that Mother would protect M.H. Rodriguez acknowledged that Mother had expressed concerns about how Father treated M.H.; however, despite the fact Rodriguez told Mother that the explanation that a four-year-old caused M.H.'s injuries was not realistic, Mother persisted in believing Father did not injure M.H. Rodriguez said that the only alternative explanation the parents gave to explain M.H.'s injuries was not possible.

Rodriguez thought termination as to both parents was in M.H.'s best interest. She explained that it was not known how M.H. was injured and that it was not known who injured M.H. She also said that Father's failure to complete services left an issue regarding his anger. Additionally, Father's positive drug test and other instances of not showing up for drug tests indicated a substance abuse issue in the home. Finally, Rodriguez said that Mother thought it was

18

possible Father had injured M.H. but was nevertheless not willing to protect M.H. Rodriguez testified that both Father and Mother knowingly placed or knowingly allowed M.H. to remain in conditions or surroundings that endangered his physical or emotional well-being. Additionally, she said both Father and Mother engaged in conduct or knowingly placed M.H. with persons who engaged in conduct that endangered M.H.'s physical or emotional well-being.

Rodriguez said she was aware Father had basically raised himself from the age of fifteen and thought that might have contributed to some of his inappropriate actions. Rodriguez described Father's demeanor as not talking very much and as being defensive most of the time when he did talk. When asked if Father seemed to love his child, Rodriguez answered, "He doesn't seem engaged in visitations." She agreed, however, that Father's personality was such that he did not appear engaged outwardly. Rodriguez acknowledged that no one ever admitted injuring M.H. However, she said the child was not in anyone else's care during the time frame that Dr. Coffman said the injury had occurred.

Rodriguez related that after the family group conference in August 2014, a home study was completed on A.L. and C.L. C.L. was Mother's sister. A.L. was C.L's husband. The home study was denied because A.L. and C.L. did not have financial stability or stable housing. There were also concerns about their protectiveness of M.H. because they did not believe either Mother or Father was responsible for M.H.'s injuries. Rodriguez said there was also an aunt from Oregon who called, but when she returned the aunt's call, the aunt never called

back.  Besides A.L., C.L., and this aunt, Mother and Father did not ask Rodriguez to look at anyone else for placement.

Rodriguez had observed Mother during supervised visits and found her to be a loving and attentive parent.  Rodriguez said her main problem with Mother was that Mother had knowledge that Father had been rough with M.H. but continued to stay with Father.  But Rodriguez denied ever telling Mother that Mother needed to separate from Father.  Rodriguez said Mother had been cooperative and had never been argumentative that she could recall.

Rodriguez said that after Father tested positive for drugs in March 2015, she asked him to complete a packet for quitting marijuana.  She said that Father responded by tossing the packet at her and telling her that he was not going to complete it unless it was ordered by the court.  She said Father was not trying to deal with his issues.

Rodriguez said Father fell asleep during visits with M.H. a couple of times.  Rodriguez testified that during visits Father would frequently have his phone out and would be texting.  Once when M.H. made a mess while being fed and when Mother had mentioned that they needed to clean the mess up, Father responded that "CPS needed to stop being lazy and do some work.  And he didn't give a shit about their complaints either."  Rodriguez said that although the Department had offered services with the hope of Father becoming a better parent, she did not believe Father had made any progress.  Rodriguez said that although Mother was generally respectful toward her and responsive to her, Father was not.

20

Rodriguez said she had checked Father's CPS history and determined he was an alleged perpetrator in 2008. She said the Department found reason to believe Father had sexually abused his stepbrother. Rodriguez thought Father's stepbrother was about four at the time. There were other children in the home at the time, and Father's father told Father that he had to leave the residence. Rodriguez said she was not aware whether the case against Father had been dismissed after Father took a lie detector test. On the other hand, Rodriguez said that she was aware that the four-year-old made an extremely specific outcry.

Father said things that concerned Rodriguez. For example, Father said he would go to prison if his rights were terminated. Rodriguez testified at length about the hazards Mother faced by remaining with Father. Rodriguez said,

> I explained to them that the rib that was broken, and I explained to them that it would have to be an excessive amount of force placed directly on that rib to fracture the rib. And that it wasn't plausible that a four[-]year[-]old did that. So the concern was that one of them injured the child, and that if neither of them would confess, then it would likely result in termination of both of their parental rights because one of them was likely to be the perpetrator and the other one would not have been protective of the other parent [sic].[4]

Rodriguez maintained that she made that clear to Mother and Father very early, probably from the time she gave them their service plans. Rodriguez said that the Department had to look at the parents as one parental unit. Rodriguez

---

[4]Rodriguez appears to have meant that if one parent was the perpetrator and the other parent remained with the perpetrator, the other parent would not be protective of the child.

continued, "It's explained to them in the beginning that if they are going to remain together, that they are seen as a unit. And so one person not completing services will directly impact the other person." Yet Rodriguez denied ever specifically telling Mother that she would have to leave Father. Even if Mother now said that she was willing to leave Father, Rodriguez's position was that it would make no difference: "She's had plenty of time to leave him." Rodriguez asserted that Mother was aware she should leave Father because, in counseling, Mother stated that was what her attorney told her. Rodriguez elaborated,

> I made it clear that there's an unknown perpetrator. And that if there is an unknown perpetrator and nobody comes forward, and they're saying that either it was this four[-]year[-]old or them and the four[-]year[-]old is not plausible, then it must be one of them. And if she knows in her mind that it wasn't her, which would only leave one person, and she still hasn't left him, and she can't—she hasn't proven that she can be stable individually from him, then—I mean, I haven't had time to assess her individually because she has not made that choice despite her attorney telling her that that would be in her best interest.

Rodriguez said, "There's an unknown perpetrator. I'm not sure which one it is." Rodriguez explained to Mother and Father that it was medically impossible for the babysitter's four-year-old to have caused the broken rib, and she said that their only response was that they did not know. Rodriguez stated that if the parents came up with a response other than the four-year-old today, that would be first time she heard a different explanation. Their only explanations were that either C.S. or C.S.'s four-year-old did it.

22

## Father's Testimony

Father testified that he was cleared of the child molestation charges against his stepbrother and that the case was dismissed. Father said he despised his parents and spat on his mother's grave for putting him through the molestation ordeal. Father acknowledged having issues because of the way he grew up. He described his upbringing as "[p]retty difficult." Father said he raised himself from the age of fifteen and that he had been homeless. He described himself as impulsive and as sometimes acting in a manner that took other people aback.

Father testified that he loved M.H. and would not do anything to hurt him. Father denied ever doing anything to hurt M.H. and, more specifically, denied ever doing anything that could have caused M.H.'s rib injury. He denied ever punching, throwing, or dropping M.H. Father said the nurses at the hospital misread his intentions. He maintained that he called his son a "little shit" in a joking manner. Father admitted falling asleep a couple times during visits. He said it was due to his work.

Father admitted he had anger management issues. But he denied ever taking his anger out on M.H. or on Mother. Father denied ever engaging in domestic violence against Mother. He denied ever popping M.H. in the face with a towel or rag. It was before M.H. was born, Father said, that he would let out his frustrations by putting holes in walls or by denting a steel door.

Father said he loved Mother. Father did not want to leave Mother, and he asserted Mother did not want to leave him. However, if it meant Mother could get M.H. back, Father said that he and Mother would most likely separate. Father testified that he would separate from Mother for M.H.'s sake.

Father asserted that he would not admit doing something he did not do. He said the only other persons who had access to M.H. were Mother and C.S. Father agreed that C.S. had M.H. for only twelve hours. Father said the doctor was wrong when the doctor said that the injury had to have happened a couple weeks before C.S. took M.H. for the night. Father said (if the doctor was right) the only other person who could have injured M.H. was Mother, and Father said he knew Mother did not hurt M.H. because he trusted her. Father said he knew he did not injure M.H. Father acknowledged that five other people cared for M.H, but he thought C.S. was the one who injured M.H. and asserted that no one else could have done it.

When asked if his hair was pink or hot pink, Father responded that it was red. Father did not think that his hair affected his employability. If his hair became an issue, Father said he would shave his head. Father said he worked in the oil fields until M.H.'s removal. After the removal, Father said he quit his job because he was depressed and was not functioning properly at work.

Father acknowledged his attitude adjustment was an on-going thing. He did not, however, think that that made him a bad father or that it was a reason to terminate his parental rights. Father acknowledged being impulsive. When

24

asked if rolling the car would have affected M.H. if M.H. had been in the car or if either Father or Mother had been killed, Father answered, "Yes," but when asked if the court should consider his rolling the car, Father answered that his parental rights should not be terminated on "what if's."

When asked if he had a problem with authority, Father answered, "Very much so." Father said his problem with authority did not affect his employer/employee relations. Father denied that a boss or employer was a person who had authority over him. Father said not having a job would not affect his ability to provide for M.H. Father explained that there were always food stamps and government-subsidized housing.

### Mother's Testimony

Mother testified that she was twenty-one at the time of trial and had married Father in 2013. Mother denied causing M.H.'s injuries, denied shaking M.H., denied ever seeing M.H. fall, and denied squeezing M.H.

Mother said M.H. was born in March 2014 and was delivered by C-section. M.H. left the hospital in mid-April. Until C.S. took everyone to the hospital, Mother asserted M.H. did not have any health complications. Mother's sister, C.L., babysat M.H. almost every weekend, and Mother's mother would visit and watch M.H. Mother's other sister, C.T., helped with M.H. as well.

Mother denied that Father had ever been abusive towards her or towards M.H. Regarding the face-wiping incident, Mother said Father was wiping milk off M.H., and M.H. started crying, so she asked Father to be more gentle. Mother

25

denied that Father was necessarily wiping too roughly and maintained that the problem was that, because he was a "preemie," M.H. had very sensitive skin. Mother said a verbal fight followed. Father called a friend, C.S., and M.H. spent that night with C.S. Mother thought C.S. left with M.H. around 7:30 and returned with M.H. around 8:00 or 8:30 the next morning. They went to the Azle hospital that day and were discharged after a few hours.

Mother said M.H. began crying every time she tried to move him, so her mother took them to a second hospital in Weatherford. Mother thought M.H. was constipated. Mother said that the doctor said M.H. looked fine and to put some cream on M.H. Mother said that the cream seemed to help, and M.H. seemed fine. Nothing was said at the second hospital about M.H.'s crying, and no x-rays were done.

Mother said that on July 23, 2014, around 9:00 or 10:00 in the morning, someone knocked on the door, Father answered, and an officer and a CPS investigator came inside. They got a ride from a neighbor and went to Cook Children's, where M.H. got CAT scans and x-rays. They were at the hospital all day, and M.H. was not released to their care. Mother testified that when they saw M.H. that next Friday, M.H. looked happy and healthy.

Regarding whether Father injured M.H., Mother said, "Well, I can't see him hurting his kid. I see the way he is with his kid, I can tell he loves his kid. I can't see him physically harming his kid. And they have no evidence against him." Mother testified that she did not know who harmed M.H. However, Mother said,

to keep M.H., she would leave Father. Mother testified that she could provide a good home for M.H., that she had a job, and that she qualified for some public assistance. Mother said her mother and sisters would help support her. Mother testified that Father acted first and thought later most of the time and acknowledged that, depending on the situation, that type of thinking could put M.H. in harm's way.

Mother denied M.H. was exhibiting symptoms on July 19, 2014, and denied that he was sensitive to the touch. Mother testified that M.H. did not show any symptoms of discomfort until after they got him back from the hospital. Mother thought that if Dr. Coffman was correct, M.H. should have exhibited some symptoms after the injury and before July 19. Mother thought the injury occurred while M.H. was with C.S. because that was when M.H. started showing symptoms of being harmed.

Mother acknowledged that when CPS took her child, she started crying because she felt she had failed to protect him. Something had happened that she was not aware of. Mother said she did not think she was being treated fairly; she asserted that the Department was blaming her because it had no one else to blame. Mother did not understand why the Department had concerns about her ability to protect M.H. if she remained with Father.

### The Trial Court's Findings on Termination and the Parties' Grounds of Error

The trial court terminated Mother's parental rights after finding that Mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child and that termination of the parent-child relationship between Mother and the child was in the child's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), 161.001(b)(2) (West Supp. 2015).[5] In two grounds of error, Mother argues that the evidence is legally and factually insufficient (1) to support the finding that she knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the emotional or physical well-being of the child and (2) to support the finding that termination of her rights was in the child's best interest.

The trial court terminated Father's parental rights after finding two grounds. First, that Father had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child, and second, that Father had failed to comply with the provisions of a court order that specifically established the actions necessary for

---

[5]Formerly Tex. Fam. Code Ann. §§ 161.001(1)(D), 161.001(2). *See* Act of Mar. 19, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18–19 (West) (codified at Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), 161.001(b)(2)).

Father to obtain the return of the child. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(E), (O) (West Supp. 2015).[6] Father does not contest either of these findings. The trial court also found that termination of the parent-child relationship between Father and the child was in the child's best interest. *See id.* § 161.001(b)(2) (West Supp. 2015).[7] In a sole ground of error, Father maintains that the evidence is legally and factually insufficient to support the finding that termination of his parental rights was in the child's best interest.

### Standard of Review

We strictly scrutinize termination proceedings and construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *In re E.R.*, 385 S.W.3d 552, 554–55 (Tex. 2012); *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985). Parental rights, although constitutional in dimension, are not absolute. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001(b) (West Supp. 2015),[8] 161.206(a)

---

[6]Formerly Tex. Fam. Code Ann. §§ 161.001(1)(E), (O). *See* Act of Mar. 19, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18–19 (West) (codified at Tex. Fam. Code Ann. §§ 161.001(b)(1)(E), (O)).

[7]Formerly Tex. Fam. Code Ann. § 161.001(2). *See* Act of Mar. 19, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18–19 (West) (codified at Tex. Fam. Code Ann. § 161.001(b)(2)).

[8]Formerly Tex. Fam. Code Ann. § 161.001. *See* Act of Mar. 19, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18 (West) (codified at Tex. Fam. Code Ann. § 161.001(b)).

(West 2014).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id.* § 101.007 (West 2014).  "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810.  Therefore, to justify termination of a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803.  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dept. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.— Fort Worth 2012, no pet.).  We need not exhaustively detail the relevant evidence supporting the termination decision if we are affirming the fact-finder's decision. *A.B.*, 437 S.W.3d at 500.

Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the challenged ground for termination and best interest were proven.  *See In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment.  *Id.*  We resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so.  *Id.*  We disregard all evidence that

a reasonable fact-finder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the fact-finder's province. *J.P.B.*, 180 S.W.3d at 573–74. And even when credibility issues appear in the appellate record, we defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573. If we determine that no reasonable fact-finder could form a firm belief or conviction that the grounds for termination or best interest were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see* Tex. R. App. P. 43.3.

<u>Factual Sufficiency</u>

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *A.B.*, 437 S.W.3d at 500. In reviewing the evidence for factual sufficiency, we give due deference to the fact-finder's findings and do not supplant the trial court's findings with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The inquiry to be made in a factual sufficiency

31

review is whether all of the evidence, when viewed in a neutral light, is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002*); In re X.R.L.*, 461 S.W.3d 633, 639 (Tex. App.—Texarkana 2015, no pet.); *In re A.B.*, 412 S.W.3d 588, 607 (Tex. App.—Fort Worth 2013) (op. on reh'g), *aff'd*, 437 S.W.3d 498 (Tex. 2014); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.).

If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67. While we are encouraged to detail the evidence when we affirm, we are not required to do so. *A.B.*, 437 S.W.3d at 507; *In re D.A.*, No. 02-14-00076-CV, 2014 WL 3778234, at *20 (Tex. App.—Fort Worth July 31, 2014, no pet.) (mem. op.) (noting that we are not required to detail all the evidence when affirming on factual sufficiency grounds). We must, however, still state the "basic reasons" for our decision. *See* Tex. R. App. P. 47.1, 47.4; *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

## Father's Sole Ground of Error
## Best Interest[9]

In Father's sole ground of error, he maintains that the evidence is legally and factually insufficient to support the findings that termination of his parental rights was in the child's best interest. We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the grounds and best-interest determinations. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *E.N.C.*, 384 S.W.3d at 807 (citing *Holley*, 544 S.W.2d at 371–72); *see E.C.R.*, 402 S.W.3d at 249 (stating

---

[9]Because we are holding that the Department failed to establish grounds on Mother, we need not address her sufficiency challenges attacking best interest. *See* Tex. R. App. P. 47.1. To successfully terminate, the Department had to prove both at least one predicate ground and best interest. *See Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).

that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"). These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

Dr. Coffman's testimony showed that M.H.'s rib fracture occurred a week or more before July 23, 2014. If true, this meant neither C.S. nor her four-year-old child were responsible for M.H.'s rib fracture, because C.S. had M.H. for only the night of July 19 and 20, 2014. The trial court was within its discretion to believe Dr. Coffman. The fact-finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony; the fact-finder may choose to believe one witness and disbelieve another. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Additionally, Dr. Coffman's testimony showed that the amount of force necessary to break M.H.'s rib had to be significant. She described the force necessary to break the rib as running over the child with a car or dropping the child out of two-story building onto an object with an edge. As a baby, M.H. was not capable of injuring himself in this manner. Mother and Father's explanation—

34

that a four-year-old stepping on M.H. broke M.H.'s rib—did not remotely come close to the tremendous amount of force necessary to break M.H.'s rib.

There was no evidence of any accident, minor or major, involving M.H. Dr. Coffman's testimony effectively showed that if an accident did not account for the broken rib, the only other plausible explanation was abuse. As there was no evidence of any accident, the trial court was within its discretion to believe that the broken rib was the product of abuse. *See id.* The question then became one of determining who had access to the baby.

The other evidence established that the only other persons who could have caused the injuries were Mother and Father. As between Mother and Father, the evidence showed that Father angered quickly or, as one witness described it, Father had a "hair trigger"; Father was impulsive to a reckless degree, as evidenced by the car accident prompted by nothing more than a dare; and Father was the only source of the extreme violence needed to break M.H.'s rib, as shown by the fact that Father was capable of putting holes in walls and dents in steel doors with his fists. Nothing indicated Mother had the temperament to injure M.H., and nothing indicated Mother was capable of the tremendous violence needed to break a rib. Father, on the other hand, when angry, was capable of punching holes in walls and denting steel doors with his knuckles. Father denied hurting M.H.; however, it was within the trial court's discretion not to believe him. *See id.*

The crux of this case was the danger to M.H.'s physical or emotional wellbeing now and in the future. Although the evidence was clear and convincing that Father was the person who injured M.H, Father refused to admit it. Father preferred to cast the blame on C.S. or C.S.'s four-year-old child when other evidence showed that was not possilble. Father's response to the injury of his child was one of avoidance of responsibility.

Father acknowledged having anger management issues at trial, but Father refused to continue anger management counseling. Mother had even complained about Father's failure to continue anger management counseling. To the extent of Father took corrective measures to address his anger management, he failed to fully assuage concerns. The fact-finder could have reasonably concluded that Father's anger issues remained unresolved.

Viewing all the evidence in the light most favorable to the finding of best interest and resolving any disputed fact in favor of that finding, we hold that a fact-finder could have reasonably formed a firm belief or conviction that best interest was proven and, therefore, that the evidence was legally sufficient. *See J.P.B.*, 180 S.W.3d at 573. Giving due deference to the fact-finder's finding, we hold that based on the entire record, a fact-finder could have reasonably formed a firm conviction or belief that best interest was proven; we hold that the evidence was factually sufficient. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 25. We overrule Father's sole ground of error.

## Mother's First Ground of Error
## Grounds under Section 161.001(b)(1)(D)

In her first ground of error, Mother argues that the evidence is legally and factually insufficient to support the finding that she knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the emotional or physical well-being of the child. Mother is attacking the trial court's finding under subsection (D) of section 161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection (D), courts examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.).

"Endanger" means to jeopardize or to expose to loss or injury. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. A child is endangered under subsection (D) when the environment creates a potential for danger to which the parent "knowingly" subjects the child. *See, e.g., In re T.H.*, 131 S.W.3d 598, 603 (Tex. App.—Texarkana 2004, pet. denied) ("[E]ven if clear and convincing evidence supported the trial court's finding that the environment posed a danger to T.H.'s well-being, the Department failed to show that [the father] knowingly placed or

allowed T.H. to remain in such an environment."); *In re B.S.T.*, 977 S.W.2d 481, 485–86 (Tex. App.—Houston [14th Dist.] 1998, no pet.), *disapproved on other grounds*, *C.H.* S.W.3d at 25–26 (finding legally insufficient evidence to support termination under subsection D because there was no evidence that father knew his children were in an endangering environment); *In re J.R.*, 171 S.W.3d 558, 571 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding evidence insufficient to show Mother knowingly allowed children to remain in endangering environment when she moved in with sex offender and record failed to show she knew of conviction for sex offense).

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(b)(1)(D). *See In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions but also to a parent's conduct in the home). Parental and caregiver illegal drug use and drug-related criminal activity supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

We focus on whether, at the time of the removal, Mother had "knowingly placed or knowingly allowed" M.H. to remain in conditions or surroundings that endangered his emotional or physical well-being. There was evidence showing

38

that, even before the removal, Mother was aware Father was capable of fits of explosive violence. Mother was aware of the holes punched into walls. Mother had witnessed Father handling M.H. roughly enough to complain about it and enough to threaten to leave him precisely for that reason. Viewing the evidence in the light most favorable to the judgment, we hold that the evidence is legally sufficient to show that Mother knowingly placed or knowingly allowed M.H. to remain in conditions or surroundings that endangered M.H.'s physical well-being. *See J.P.B.*, 180 S.W.3d at 573 (setting out standard for legal sufficiency). We overrule Mother's first issue to the extent she complains about the legal sufficiency of the evidence. The remaining question is whether the evidence was factually sufficient.

A great deal of other evidence attenuated or raised questions about what Mother knew precisely before the removal. According due deference to the fact-finder's findings, for the reasons set out below, we nevertheless hold that a rational trier of fact could not have found that the evidence, when viewed in a neutral light, was clear and convincing that Mother knowingly placed or knowingly allowed M.H. to remain in conditions or surroundings that endangered the emotional or physical well-being of M.H. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 25.

Although Father punched holes in the walls and dented steel doors with his knuckles, Mother did not equate the violence Father directed at these inanimate objects with danger to herself or to M.H. There was no evidence of domestic

39

violence between Mother and Father. The family therapist did not know if Father engaged in this conduct in front of M.H. or Mother. The family therapist did not even know if Father put the holes in the walls before M.H. was born. Mother made it clear that the idea of Father hurting M.H. was, to her, unthinkable. Although we might question her judgment for purposes of best interest, especially after the additional evidence provided by the trip to Cook Children's Hospital, the evidence showed Mother had a blind spot to the danger Father's anger and violence posed to both her and their child.

Mother had complained about Father's rough handling of M.H. But the other evidence showed that the rough handling was not enough to cause hospital staff, the caseworker, or other Department monitors to physically separate Father from M.H., and, despite the rough handling, there was no evidence the caseworker sought to stop any visits between Father and M.H. Father's rough handling of M.H. certainly raised concerns, but whatever the line is between cause for concern and actual endangerment, the hospital staff, the caseworker, and the Department monitor showed by their actions that Father had not crossed it. The evidence showed Mother, when alone with Father, spoke up to protest Father's rough handling of M.H. Mother's protests may have been the subject of the arguments at the hospital that the staff complained about, and Mother's protests were what prompted Father to call C.S. on July 19, 2014. We hesitate to fault Mother for how she handled Father when the caseworker handled Father's behavior in the same way—with an admonishment to stop. The

40

evidence showed that Father was recalcitrant to any admonishments, whatever their source. During visits, when the caseworker instructed Father to change his behavior, the caseworker faulted Mother for not also instructing Father to modify his behavior. Under those circumstances, however, Mother's admonishment would have been redundant, and, given Father's temperament, might have served only to antagonize him. Mother's failure to add her admonishment on top of the caseworker's admonishment carries little weight as evidence of a failure to protect, especially where, when alone, Mother had shown the ability to speak up.

Father "punched it" in a car on a dare and ended up flipping the car three times. Father did this while Mother was in the car with him. Mother prophesied that Father would have engaged in the same conduct even if M.H. had been in the car. This car accident, however, was in March 2015, after the removal. Mother did not have the benefit of the insight this incident provided into Father's impulsiveness and recklessness until after the removal. Her failure to recognize the danger Father's impulsiveness and recklessness posed even after this incident might raise questions about best interest, but best interest is not what we currently are deciding. This March 2015 incident is not evidence of what Mother knew before July 23, 2014.

To determine whether a parent knowingly placed or knowingly allowed a child to remain in circumstances that posed a danger to the child, we are to examine the time prior to removal in determining whether the environment of the home posed a danger. *See L.E.S.,* 471 S.W.3d at 926 ("In evaluating

41

termination under ground (D), . . . we are to examine the time prior to . . . removal to determine whether the environment of the home posed a danger to [the child's] physical or emotional well-being."). Subsection D is not a basis for terminating parental rights if the parent was unaware of the endangering environment. *See T.H.*, 131 S.W.3d at 603 ("[E]ven if clear and convincing evidence supported the trial court's finding that the environment posed a danger to T.H.'s well-being, the Department failed to show that [the father] knowingly placed or allowed T.H. to remain in such an environment."); *B.S.T.*, 977 S.W.2d at 485 (finding legally insufficient evidence to support termination under subsection D because there was no evidence that the father knew his children were in an endangering environment).[10]

Mother said she observed no symptoms from M.H. before July 19, 2014. There was no testimony about how a baby would react to a broken rib like the one M.H. experienced. Common sense would suggest M.H. would have shown intense pain and discomfort. On the other hand, C.S. described M.H.'s problems on the night of July 19, 2014, as breathing issues caused perhaps by Mother's and Father's smoking. During the middle of the night, C.S. thought M.H. was

---

[10]However, a parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient. *See In re S.M.L.*, 171 S.W.3d 472, 477–78 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) ("It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk."); *In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.).

choking, but she thought it might be due to phlegm. The doctors at the Azle hospital said nothing was wrong with M.H. on July 20, 2014. Even on July 23, 2014, when M.H. was taken to Cook Children's Hospital, M.H. had no observable injuries or bruising and, until after the x-rays were taken, no one could say definitively whether M.H. was injured. In short, there was a great deal of evidence showing that although something was apparently wrong with M.H., whatever was wrong with him was not immediately recognizable as a broken rib or, for that matter, even as some sort of physical abuse.

Father attributed M.H.'s behavior after July 19, 2014, to something C.S. had done to M.H. during the night of July 19 and 20, 2014. The x-rays from July 23, 2014, however, exculpated C.S. They identified the injury, identified the force necessary to cause the injury, and placed the injury well before C.S. had M.H. in her possession. The x-rays from July 23, 2014, however, were not available to Mother until after the trip to Cook Children's Hospital, and from Cook Children's Hospital, M.H. was not thereafter released to Mother and Father's care. Before the trip to Cook Children's Hospital, as noted above, Mother had a plausible basis for not knowing about the injury and, as discussed here, assuming there was an injury, a plausible basis for suspecting C.S., not Father, was the cause of it. There was a rational basis for concluding Father lied to Mother about injuring M.H. in the first place and thereafter lied to Mother about C.S. being the person who caused M.H.'s injuries. If Father admitted injuring M.H., Father risked his relationship with Mother, risked his parental rights with M.H., and risked a

43

criminal indictment for injury to a child. *See* Tex. Penal Code Ann. § 22.04(a) (West Supp. 2015). Mother testified that she believed Father's denials of responsibility for M.H.'s injury. The evidence developed after the removal made Mother's continued belief in Father untenable. Her continued belief in Father, despite the evidence, might be a factor when considering best interest, but the evidence developed after the removal cannot be used retroactively to show what Mother knew before the removal. *See L.E.S.*, 471 S.W.3d at 926.

Regarding Father's drug usage, he tested positive twice for marijuana—once when M.H. was first born—so Mother could not plead ignorance. The evidence was, therefore, clear and convincing that he was using marijuana, but whether he was still using anything stronger was speculation. C.S. suspected that, based upon his appearance, perhaps he had used harder drugs after leaving her home. Father told an investigator that his use of other drugs was in the past. Similarly, Father told the family therapist that his use of all drugs was a thing of the past. A positive drug test in March 2015 belied that assertion, at least with respect to marijuana. However, the family counselor said marijuana was "a concern, not abusive." She further stated that marijuana made some people mellow while making other people, although not many, angry. There was no evidence regarding whether marijuana mellowed Father or agitated him. Possession of marijuana is admittedly illegal in Texas. *See* Tex. Health & Safety Code Ann. §§ 481.121(a) (defining offense), 481.121(b)(1) (providing that possession of two ounces or less is Class B misdemeanor) (West 2010).

44

However, without more, we are not prepared to say that smoking marijuana invariably rises to the level of endangerment under subsection (D). Breaking the law is not tantamount to endangering a child.[11] A parent's going to jail repeatedly might destabilize a child's life, but there was no evidence Father was going to jail repeatedly for possessing or smoking marijuana.

We hold that based on the entire record, a fact-finder could not reasonably form a firm conviction or belief that Mother knowingly placed or knowingly allowed M.H. to remain in conditions or surroundings that endangered his emotional or physical well-being. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 25. We hold that the evidence, when viewed in a neutral light, is factually insufficient to support the trial court's finding of endangerment by Mother. We sustain Mother's first issue to the extent it complains of the factual insufficiency of the evidence.

---

[11]Father turned twenty-one after M.H.'s birth and a few months before the events of July 2014. By comparison, if Father had admitted drinking beer before his twenty-first birthday, that too would have been illegal. *See* Tex. Alco. Bev. Code Ann. §§ 106.01 (West 2007) (defining "minor" as a person under twenty-one), 106.05 (West Supp. 2015) (setting out the offense), 106.071(b) (West Supp. 2015) (providing that first offense is Class C misdemeanor). Although possessing a beer under the age of twenty-one will, with some exceptions listed in section 106.05 of the statute, be illegal, it is not impossible to imagine a scenario where a twenty-year-old parent could responsibly drink a beer without endangering a child.

45

**Conclusion**

Having overruled Father's ground of error, we affirm the trial court's judgment as to him.  Having sustained Mother's first ground of error to the extent she attacks the factual sufficiency of the evidence, we reverse the trial court's judgment as to the termination of her parental rights and remand the cause to the trial court for further proceedings consistent with this opinion as to her.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  GARDNER, GABRIEL, and SUDDERTH, JJ.

GABRIEL, J., filed a concurring and dissenting opinion.

DELIVERED:  February 5, 2016